(No. 35043.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DONALD RYBKA *et al.*, Plaintiffs in Error.

*Opinion filed March 20, 1959—Rehearing denied May 19, 1959.*

Francis J. Kennedy, Edmund H. Grant, Michael H. Brodkin, Charles A. Bellows, and Jason Ernest Bellows, all of Chicago, for plaintiffs in error.

Latham Castle, Attorney General, of Springfield, and Benjamin S. Adamowski, State's Attorney, of Chicago, (Fred G. Leach, William H. South, Francis X. Riley, and John T. Gallagher, of counsel,) for the People.

Mr. Justice Schaefer delivered the opinion of the court:

The March, 1957, grand jury for Cook County indicted thirteen persons jointly for the murder of Alvin Palmer on March 11, 1957. Each of the defendants, Joseph Schwartz, Ronald Rybka, Thomas Trybula, Edward Fron, James Adams, Lawrence Adas, Lawrence Pavlik, Frank Nowobielski, Raymond Kozlowski, Andrew Budz, Edward Gorski, Alvin Zurek and Donald Duchak, pleaded not guilty and waived a trial by jury. Schwartz was granted a severance for trial. He was found guilty, and sentenced to imprisonment in the penitentiary for a term of 50 years. A severance was also granted to Adams and the indictment against him was subsequently *nolle prossed* by the State.

The eleven remaining defendants were tried jointly. Pavlik, Nowobielski, Zurek and Duchak were found not guilty. The other seven defendants were found guilty but Adas and Kozlowski were allowed a new trial. Motions for new trials were denied as to the others. Rybka was sentenced to imprisonment in the penitentiary for a term of 20 years, and Gorski, Trybula, Fron and Budz were each sentenced for a term of 14 years. The judgments convicting these five defendants are before us on writ of error. The major contention of each defendant is that the evidence was insufficient to prove his guilt beyond a reasonable doubt.

The following facts are not disputed. Alvin Palmer, a negro high school student, was struck on the head with a

hammer by Joseph Schwartz at approximately 10:00 P.M. on March 11, 1957, and died the next morning without regaining consciousness. The assault, which was not provoked by Palmer, occurred at the corner of 59th Street and Kedzie Avenue on the south side of Chicago. Nowobielski, Adams, Pavlik and plaintiffs in error Rybka, Fron and Trybula were present when the crime was committed. With Schwartz, they had left a candy store at 51st Street and Wolcott at approximately 9:30 P.M. in an Oldsmobile automobile driven by Rybka. A second car, a Chrysler driven by Adas and carrying Zurek, Kozlowski, Duchak and plaintiffs in error Budz and Gorski had left the candy store at the same time and followed behind the Oldsmobile until it reached 63rd Street and California where the two cars separated. All of the occupants of both cars were acquainted with one another, and all were under 21 years of age. Those in the Chrysler were not present when Schwartz attacked the deceased.

Each defendant in this case was charged with the crime of murder. There is no evidence indicating that any of the plaintiffs in error struck at Palmer or threatened him in any way. Section 2 of division II of our Criminal Code defines an accessory before the fact as "he who stands by, and aids, abets or assists, or who not being present, aiding, abetting or assisting, hath advised, encouraged, aided or abetted the perpetration of the crime." (Ill. Rev. Stat. 1957, chap. 38, par. 582.) Proof beyond a reasonable doubt that a defendant acted as a principal or as an accessory before the fact will sustain a conviction on an indictment as a principal. (*People* v. *Woods*, 393 Ill. 586.) If these convictions are to be sustained, it must be on the ground that the plaintiffs in error were accessories before the fact. To sustain the convictions the State relies on the testimony of Wilmore Johnson, James Adams and Joseph Schwartz, and also upon statements made by each plaintiff in error.

Wilmore Johnson testified that he was standing near the

corner of 59th and Kedzie waiting for a bus, and that a young boy whom he learned was Alvin Palmer was standing nearby. A white boy came across the street and looked at the Palmer boy and Johnson. "He give us one of the nastiest looks I ever seen." The white boy stood against a light post and stared at Palmer and Johnson for several minutes, then a bunch of boys came around the corner out of the alley. "They came right by me walking on the sidewalk. It looked like they were marching. I'd say there were seven or eight of them walking in twos, then in threes, and then in twos and they got pretty close to the other boy that was standing on the corner, like all in a huddle, seemed like." As soon as they got there the white boy who had been standing on the corner grabbed Palmer with his left arm and struck him with the hammer with his right. He then struck at Johnson with the hammer, saying, "I'll kill you, you black son-of-a-bitch." The boys ran around the corner after Palmer had fallen and the white boy had struck at Johnson with the hammer. He did not see anyone but the assailant touch Palmer, nor did he see any signs of recognition between the assailant and the other boys, and he heard nothing said except when the assailant struck at him with the hammer.

James Adams, who was indicted but not tried with the defendants, testified that he was with the defendants and Schwartz at the candy store on the night Palmer was murdered, that they left the store about 9:30 P.M. in the two cars, the Oldsmobile leading and the Chrysler following. He identified the occupants of each car, but denied that he had agreed to assault anyone or that such an agreement was made in his presence.

Joseph Schwartz was called as the court's witness and was cross-examined by an assistant State's Attorney and four defense counsel. He testified that all of the codefendants were at the candy store prior to the attack on Palmer and that there was a conversation outside the store about

rolling someone and taking his money, topcoat and shoes; that the group then left in the Oldsmobile and the Chrysler, "looking for a well-dressed man;" that he knew the boys in the Chrysler better and tried to get into that car but it already was full so he got into the Oldsmobile; that the Oldsmobile went first and the Chrysler followed to 63rd and California where "they got a red light" and the Oldsmobile proceeded on to 59th and Kedzie and he got out of the car there. Schwartz' recollection as to who was present during the discussion outside the candy store and exactly what was said was hazy and partially self-contradictory. Of the plaintiffs in error he remembered only Gorski and Budz as being present and he was hesitant about Budz. He could not recall whether there was a continuation of the conversation in the Oldsmobile on the way to 59th and Kedzie. However, he had no difficulty remembering what transpired after the Oldsmobile arrived at 59th and Kedzie. He testified that he saw a colored boy on the corner whom he had since learned was Alvin Palmer. He got out of the Oldsmobile and crossed the street to a light pole where he stood for "four or five minutes looking at the colored boy." The Oldsmobile turned left on Kedzie and "parked someplace" and the other boys "came back in four or five minutes." He saw them as they walked toward him on 59th Street and he did not attack Palmer until they came up to where he was standing. He then "swung wild" and hit Palmer with the hammer. He and the other boys ran, and he got back into the Oldsmobile on a side street about a block away and they all went back to the candy store in the car. Schwartz denied that there was a "plan" to assault a negro or rob anyone and claimed that he hit Palmer with the hammer on "the spur of the moment." He testified that one of the boys in the Oldsmobile told him they were coming back when he got out of the car, although he could not recall the exact words or by whom they were spoken. He also stated that he thought one of the boys from the Oldsmobile said either

"We're ready" or answered "Yes" when he asked "Are you ready?" as they joined him on the corner of 59th and Kedzie and that he hit the Palmer boy "almost immediately" afterward.

Prior to their indictment each defendant had been questioned by an assistant State's Attorney concerning his knowledge of the murder of Alvin Palmer. Their statements, in question and answer form, were reduced to writing. Each statement was admitted as evidence only against the defendant who made the statement. Inasmuch as there is no indication in the record that any codefendant adopted the statement of another as his own, our review of the evidence available to sustain each conviction is similarly limited. (*People* v. *Childress*, 1 Ill. 2d 431.) None of the plaintiffs in error contends that his statement was coerced or otherwise illegally induced.

Ronald Rybka admitted in his statement that before they left the candy store he had heard someone, he believed it to have been Schwartz, say "Let's go and get some colored guys"; that six or seven boys, including Schwartz, jumped into his car; that he drove but Schwartz told him which way to go; that the plan was to get a negro in a white neighborhood and take his shoes by force or otherwise; that Schwartz had the hammer in the car and when Rybka asked what Schwartz intended to do with it Schwartz replied, "Hit him"; that when Rybka said that they had enough guys and should just use their fists, Schwartz said "No"; that Schwartz said "There's one" when they reached 59th and Kedzie and he saw a negro standing on the corner; that Schwartz got out of the car and Rybka asked Schwartz to get back in but Schwartz told him to go around the corner and park the car; that Schwartz had the hammer when he got out of the car and that Rybka knew what Schwartz was going to do with it; that he parked the car and walked back with the other boys to 59th and Kedzie where Schwartz and the two negroes were standing; that he and the others

walked past the two negroes toward Schwartz who then walked toward the negroes; that one of the negroes was lying on the ground and Schwartz was yelling at the other by the time he got to the corner, and that everyone then ran and he went back and got his car and picked up the others, including Schwartz and drove back to the candy store where they met the boys who had left in the Chrysler.

Rybka signed this statement. At the trial he admitted that he read the statement before he signed it and made only one change in the transcript. He testified, however, that his statement was inaccurate and that he was leaving the candy store to take two of the boys home when Schwartz jumped in and that he had no knowledge of a plan to get a negro or that Schwartz intended to hit anyone. He admitted that Schwartz was pounding a hammer in the palm of his hand while in the car and that Schwartz stated that he wanted to get some shoes. He denied knowledge that Schwartz had the hammer when he got out of the car and explained that he was afraid of Schwartz and only parked the car and rejoined Schwartz when one of the other boys suggested that they should get Schwartz and bring him back. He also denied any intent to assist Schwartz in the assault on Palmer.

Edward Fron also made a statement in which he admitted hearing some of the other boys say "Let's go get some negroes" and making jokes about it before they left the candy store; that he heard Schwartz say he had a hammer and intended to pound somebody with it; that he, Fron, got in Rybka's car and heard Schwartz say in the car "Let's go get a nigger"; that someone said "There's one" when they arrived at 59th and Kedzie and Schwartz got out of the car; that Rybka parked on a side street and someone then said "Let's go" and they walked back to the corner and that he saw Schwartz hit Palmer with the hammer; that he ran and Rybka picked them all up and drove back to the candy store where they waited for the Chrysler, and

that he was ready to help with his fists if Schwartz needed assistance. Fron refused to sign this statement because he was "all mixed up." At the trial he testified that the statement, although accurately transcribed, was not true; that he gave false answers because he was confused, afraid and had a headache. He denied any intent to assist Schwartz in the assult on Palmer.

Thomas Trybula's statement denied any knowledge of a plan to attack a negro before the group left the candy store but admitted that while he was in Rybka's car someone said, "Let's get a nigger" and someone else answered "Yeah, we'll get one, I need a pair of shoes bad"; that Schwartz had a hammer and when Rybka said "Don't use that, you'll kill him, use your fist" Schwartz answered that he needed shoes badly and was going to "hit him"; that there was a negro standing on the corner of 59th and Kedzie and Schwartz got out of the car and said "Meet me back here"; that they asked Schwartz to wait but he went anyway and that Trybula knew that Schwartz was getting out to hit the negro; that they intended to help Schwartz with their fists if he needed help, but not with weapons; that they parked the car and went back to 59th and Kedzie and saw two negroes and he asked one of the boys "Are we going to get them?" and received the answer "Yes, I think so" and that he, Trybula, expressed the hope that Schwartz wouldn't use the hammer; and that Schwartz didn't even wait for the others but just hit the negro and they all ran away and Rybka picked them up in his car and they went back to the candy store.

Trybula signed this statement. At the trial he testified that he was confused when he made the statement. He denied that he saw the hammer, that he intended to help Schwartz or that he knew what Schwartz was going to do when he got out of the car. He could not remember if he had made many of the admissions contained in his statement. On cross-examination he testified that he sat between

Schwartz and Rybka in the car and that he thought someone had said in the car "Let's go get a nigger" and Rybka had said "Don't use that, you'll kill him, use your fist."

Andrew Budz did not testify at the trial. In his statement he admitted that he was with the other defendants at the candy store before the attack on Palmer and that "everyone" was talking about "rolling" somebody (which he defined as "strong-armed robbery"); that someone said "Okay, let's go" and that he got into Adas's Chrysler; that they were going to ride around and see if they could get some money but that he saw no hammer and did not hear anyone make specific reference to negroes; that the Oldsmobile and the Chrysler left the candy store together but those in the Chrysler saw a drunken white man at 63rd Street and turned off to "roll" him while the Oldsmobile went straight on; that those in the Chrysler intended to jump the man they saw from behind and take his money but that he entered a house before they could act; that thereafter they "kept on looking" and then returned to the candy store; that the Oldsmobile had already returned and Schwartz said they had assaulted a negro at 59th Street and he had hit him on the head with a hammer; that Budz saw the hammer at this time and asked Schwartz if he got any money and Schwartz answered that he had not, he was going to take his shoes but the others ran; and that Budz, Schwartz and two other boys then drove past the corner of 59th and Kedzie which Schwartz pointed out as the place where he had attacked Palmer. Budz was asked whether they would have split the money afterwards if they had rolled someone and he answered: "Whoever went out and got him, say, like two of us went, us two would split, I guess."

Edward Gorski's statement admitted that he was at the candy store with the other defendants and that their intention was "to get a nigger"; that everyone was talking about it and someone wanted to get his money and that he said

"I'll go"; that he got in the Chrysler driven by Adas and they followed the Oldsmobile until they came to a stop-light at 63rd and California; that the Oldsmobile made the light but the Chrysler did not and, after the light changed, the Chrysler turned right on California; that they saw a drunken man and were going to get his money but he went into a building and so they kept riding around looking for another victim but were unsuccessful; that they returned to the candy store and those who had left in the Oldsmobile were all saying that they "got a nigger" and Schwartz said they saw a negro on the corner, and they got him; that he, Gorski, forgot about attacking a negro after the Chrysler had turned off on California.

Gorski refused to sign the statement. At the trial he testified that he did so because all of the statement was not true, although he admitted that it was an accurate transcript of his answers and the questions asked. He denied that he heard any conversation about getting a negro or taking his money or that those in the Chrysler intended to roll anyone. He explained that he went along in the Chrysler for the ride and had no intent to attack anyone and knew of no such plan.

The murder of Alvin Palmer by Joseph Schwartz is not disputed. But it is suggested on behalf of the defendants that their mere presence at the scene of a crime, or their "negative acquiescence" in its commission is not enough to involve them as accessories before the fact under section 2 of division II of the Criminal Code. (*People* v. *Shields,* 6 Ill. 2d 200; *White* v. *People,* 81 Ill. 333.) But there is more here than just presence at the scene of the crime. An examination of the statements made by each plaintiff in error shows that, with the exception of Trybula, each knew when he left the candy store that an unlawful assault, involving physical violence, was contemplated. And Trybula admitted that he was aware of this intent before the car in which he was riding arrived at 59th and Kedzie. There is no indica-

tion that any of them objected to the proposed assault or that they were in any way forced to join the others in the search for a victim.

One may aid and abet without actively participating in the overt act. (*People* v. *Marx*, 291 Ill. 40; *People* v. *Taylor*, 319 Ill. 174; *People* v. *Brendeland*, 10 Ill. 2d 469.) Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction as a principal for a crime committed by another in furtherance of the venture. *People* v. *Tarver*, 381 Ill. 411; *People* v. *Rudecki*, 309 Ill. 125.

Ronald Rybka, Thomas Trybula and Edward Fron accompanied Schwartz to the corner of 59th and Kedzie, were present when Palmer was attacked, and fled the scene with Schwartz afterward. These facts alone give rise to a justifiable inference that the assault on Palmer was pursuant to a common purpose. (*People* v. *Thicksten*, 14 Ill.2d 132.) In addition, Rybka, Trybula and Fron each admitted that, after the car was parked, he rejoined Schwartz knowing he had a hammer and that he intended to hit someone with it. Each of them was willing to use his fists if Schwartz needed help. And, despite Schwartz' claim that he acted on "the spur of the moment," his testimony, and that of Johnson, that he did not attack Palmer until the others returned warrants a conclusion that Schwartz relied on their support and encouragement. Each of them was properly convicted of the murder of Alvin Palmer.

Andrew Budz and Edward Gorski were not present when Schwartz attacked Palmer. Their statements indicate that the Chrysler in which they were riding separated from the Oldsmobile carrying Schwartz and that those in the Chrysler then made an independent search for a victim to assault. While each admitted that they still intended to carry out the plan to "roll" someone formulated back at the candy store, Budz and Gorski denied that they intended to

do so in conjunction with Schwartz after their car turned off at California Avenue. Section 2 of division II of the Criminal Code includes as an accessory before the fact one who, although not present, advises or encourages the perpetration of a crime by another. Budz admitted that "everyone" was talking about rolling someone before they left the store and Gorski recalled that "everyone" was then talking about getting a negro. Schwartz testified that when he left the candy store "we were going to roll a well-dressed man" and that he tried to get into the Chrysler first because he knew the boys in that car better. The two cars left the store together. The evidence before us supports a finding that the conduct of Budz and Gorski influenced Schwartz' unprovoked attack on the negro boy.

It is alternatively contended on behalf of Budz and Gorski that, even though it be concluded that they encouraged Schwartz in the perpetration of a crime, the evidence indicates that they withdrew from any concert or common venture with those in the Oldsmobile when the Chrysler turned off at California Avenue and that the fact of their withdrawal was communicated to Schwartz. Our attention is called to the general rule that "one who withdraws from a criminal enterprise is not responsible for the act of another subsequently committed in furtherance of the enterprise, provided the fact of withdrawal is communicated to the other conspirators." (14 Am. Jur., Criminal Law, sec. 80; see also 22 Corpus Juris Secundum, Criminal Law, sec. 94.) However, it is the communication of intent to withdraw and not the naked fact of withdrawal that determines whether one who advised, encouraged or incited another to commit a crime is to be released from liability as an accessory before the fact. *Karnes* v. *State*, 159 Ark. 240, 252 S.W. 1; *State* v. *Peterson*, 213 Minn. 56, 4 N.W.2d 826; *Galan* v. *State*, 44 Ohio App. 192, 184 N.E. 40; *Forman* v. *State*, 220 Miss. 276, 70 So. 2d 848; *Commonwealth* v. *Doris*, 287 Pa. 547, 135 Atl. 313.

The evidence relied on to prove that Schwartz was aware of the alleged defection of Budz and Gorski is at best equivocal. Schwartz testified only that the Chrysler "got a red light" at 63rd and California and the Oldsmobile proceeded on. He was not questioned as to whether he expected the Chrysler to rejoin the Oldsmobile after the light changed. The statements made by Budz and Gorski do not indicate a withdrawal. They continued their search for the victim "everyone" sought when they left the candy store together, and only deviated from the course taken by the Oldsmobile. There is no indication that they attempted to discourage or dissuade Schwartz from doing just what they were doing. The evidence justified the conclusion of the trial judge that there was no effective withdrawal.

Other contentions made on behalf of the plaintiffs in error are not persuasive. It is argued that the death of Palmer was not foreseen or desired by anyone and was due solely to the impulsive act of Schwartz. But each of these defendants admitted an understanding that the group left the store to "get a negro" or to "roll somebody." Either purpose contemplates the unlawful use of force and violence. As this court stated in *Lamb* v. *People,* 96 Ill. 73, 83-84: "* * * if the unlawful act agreed to be done is dangerous or homicidal in its character, or if its accomplishment will necessarily or probably require the use of force and violence, which may result in the taking of life unlawfully, every party to such agreement will be held criminally liable for whatever any of his co-conspirators may do in furtherance of the common design, whether he is present or not."

The sufficiency of the evidence is also attacked on the ground that the conviction of each defendant was based solely upon his own admissions which were uncorroborated by competent evidence. Reliance is placed on three cases, (*People* v. *LaCoco,* 406 Ill. 303; *People* v. *Hobbs,* 400 Ill. 143; *People* v. *Nitti,* 312 Ill. 73,) but we are unable to see their applicability here. The *corpus delicti* was established

by the testimony of Wilmore Johnson and Schwartz, and the identification of the plaintiffs in error by the testimony of James Adams and Schwartz. The statements made by the plaintiffs in error contain damaging admissions of complicity with Schwartz which, in conjunction with the other evidence, prove their guilt of the murder of Alvin Palmer. (*People* v. *Mowry*, 6 Ill. 2d 132.) "The law is well established in this State that since the accused can expressly admit away his whole case by pleading guilty, he can admit away any part of it." *People* v. *Hobbs*, 400 Ill. 143, 151.

The guilt of each of the defendants was proved beyond a reasonable doubt. The judgments of the criminal court of Cook County are affirmed.

*Judgments affirmed.*